IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BOOKER T. MILES,    )
    )
    Complainant,    )
    )
vs.    )    Case No. 05-3386-CV-S-ODS
    )
JO ANNE BARNHART,    )
Commissioner of Social Security,    )
    )
    Respondent.    )

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born on March 29, 1959, is 5'10" and has weighed between 310 and 330 pounds at all times relevant. R. at 37, 137, 144. Plaintiff has some college education, plus training as a diesel mechanic. He has prior work experience as a heavy equipment diesel mechanic. On September 15, 2003, Plaintiff was working on a diesel engine removing the motor mount. R. at 37. When Plaintiff bent to pick it up, he heard a "pop" and felt a burning sensation in his lower back. R. at 37. On November 24, 2003, Plaintiff filed an application for Disability Insurance and Benefits. R. at 75-77. In his report, Plaintiff stated he could not work because of lower back pain, compressed nerves and arthritis. R. at 90.

On September 22, 2003, Plaintiff was examined by Dr. L.D. Atkinson at General Medical Center II. R. at 120. He was treated with Toradol and Norflex injections, prescribed Lodine and Flexeril and told to stay flat on his back. R. at 123. On September 25, Plaintiff reported to Dr. Atkinson for a follow up appointment. He was instructed to continue on his pain medication and to schedule an MRI. R. at 123.

On September 29, 2003, Plaintiff reported to MRI of Springfield for an MRI of the lumbar spine. He complained of low back pain, left leg pain, numbness and tingling. R. at 117. An MRI showed there was a focal disc protrusion laterally to the left at the L3-4 level, resulting in left-sided neural foraminal stenosis and compression of the exiting left L3 nerve root, and a broad-based spondylitic disc bulge and osteophyte complex to the left at L4-5, resulting in left-sided neural foraminal stenosis and compression of the exiting left L4 nerve root when combined with facet hypertrophy. R. at 118.

On November 10, 2003, Plaintiff reported to Springfield Neurological Imaging for a Lumbar Myelogram performed by Dr. H. Mark Crabtree. R. at 126. The myelogram showed minimal bulging at L4-5 and L3-4. R. at 126. A CT Lumbar Spine Post Myelography performed on the same day showed a suggestion of a small protrusion of the disc at L4-5, but the original L3-4 abnormality described on the MRI was not re-identified. R. at 125. On November 25, Plaintiff returned for an MRI Lumbar Spine without contrast. R. at 124. The MRI showed a very small left lateral disc protrusion at L4-5, mild encroachment on the lateral recess and no definite compression of the left-sided L4 nerve root. R. at 124.

On December 11, 2003, Plaintiff presented to the Springfield Neurological and Spine Institute (SNSI) complaining of left leg pain. R. at 187. An examination by Dr. Ted A. Lennard revealed mild to moderate restrictions in lumbar movement and left sided lumbar radiculpathy. R. at 189. At that time, Plaintiff started a therapy program three times a week for two weeks. On December 18, 2003, Plaintiff received a left L4 Transforminal Epidural Steroid Injection from Dr. Lennard. R. at 186.

On January 5, 2004, Plaintiff returned to SNSI and reported to Dr. Lennard that he received approximately one week of relief from the epidural. His primary pain complaint was in the lower back extending into the anterior thigh. He rated his pain at a 5 to 6 on a 1 to 10 scale. R. at 185. Dr. Lennard recommended physical therapy, told Plaintiff to refrain from lifting greater than ten pounds, and avoid bending activities. Plaintiff's wife reported some concern about his attitude changes, so Dr. Lennard prescribed Paxil. R. at 185. Plaintiff returned on January 26 for another epidural

2

injection. R. at 183. He complained of pain in his back and anterior leg on the left side, down to the knee. The pain was still between 5 and 6, but he believed he was improving somewhat. Paxil helped to adjust his mood. R. at 184. At that time, he was restricted to lifting no more than 15 pounds. R. at 184.

On February 2, 2004, Plaintiff returned to SNSI and saw Dr. Lennard. He stated he did well following the second injection for about one week, but felt "two pops" in his back during therapy. R. at 182. He was maintained on a 15 pound lifting restriction and therapy was temporarily postponed. R. at 182. He returned on February 10 for an electrodiagnostic study and general follow-up appointment. R. at 181. The electrodiagnostic study revealed no electrical evidence of a lumbosacral radiculpathy. The possibility of surgery was discussed at this time. Dr. Lennard recommended Plaintiff restart his therapy and maintain the 15 pound lifting restriction. R. at 181.

On February 12, 2004, Plaintiff presented to Functional Individualized Training (FIT) for aquatic therapy. R. at 200. Plaintiff reported the aquatic therapy helped relieve some of the pain, but he still could not stand for a long period of time. R. at 207. He rated his pain at a consistent 5 of 10. R. at 208.

On February 24, 2004 Plaintiff returned for a follow-up visit and reported aquatic therapy had reduced his pain and improved his motion. R. at 178. He continued to rate his pain between 5 to 6 and felt intermittent numbness in the left anterolateral thigh and leg. R. at 178. Dr. Lennard noted Plaintiff had improved somewhat over the last several weeks and encouraged Plaintiff to continue his therapy program. R. at 178. During Plaintiff's March 5 follow-up visit, Dr. Lennard reported Plaintiff was slowly improving and having less pain generally in the back. Plaintiff complained that he did not believe his Hydrocodone prescription was working and Dr. Lennard prescribed Ultram to replace it. R. at 177. He was encouraged to continue his therapy and his activity was upgraded to a 25 pounds lift restriction until his next visit. R. at 177.

On March 26, 2004, Plaintiff met with Dr. Lennard again. He reported continued lower back pain and rated it a 6. He stated the pain was made worse with lifting, bending and standing, but improved with lying flat on the floor. R. at 176. He reported therapy had been of some benefit and overall he felt strong. In retrospect, he felt the

3

epidurals had given him some mild temporary relief. R. at 176.

On April 27, 2004, Plaintiff met again with Dr. Crabtree. He recommended a closed MRI with a heavyweight magnet to address any issues present in L3-4 and L4-5. R. at 175. On May 3, 2004, Plaintiff met with Dr. Lennard to discuss his progress and the MRI report. The report revealed disc protrusion at the L4-5 level, but was otherwise normal. R. at 173. Dr. Lennard noted Plaintiff was a large, overweight male who moved slowly from the seated to standing position with moderate restrictions in movement and general tenderness throughout the lumbosacral junction. R. at 173.

On May 25, 2004, Plaintiff returned for a follow-up with Dr. Crabtree. R. at 172. Dr. Crabtree noted Plaintiff was "quite large" and recommended he seriously consider weight loss as part of his rehabilitation. He further recommended surgery, as non-surgical treatment had been unsuccessful. R. at 172.

A hemilaminotomy with microdiscectomey was performed on June 9, 2004. Post-surgery, Plaintiff reported most of his leg pain had improved but he still has some tingling. R. at 170. He complained of mild back pain at the incision area, but far less than prior to his surgery. Dr. Crabtree recommended he begin a course of physical therapy, continue taking non-steroidal anti-inflammatory drugs and follow up with him at the completion of therapy. R. at 170. On August 26, Plaintiff returned for a follow-up appointment with Dr. Crabtree. Plaintiff reported no lower extremity pain and great improvement in his back pain. While pleased with the outcome of the surgery, he reported some difficulties with heavy work and increased activity. R. at 169.

On September 10, 2004, Plaintiff met with Dr. Lennard for a final rating and release. Upon examination, Dr. Lennard determined Plaintiff was an overweight, poorly conditioned male who moved relatively well from the seated position to upright position, and walked without a limp. He had a well-healed scar in the lumbar region with mild limitations in lumbar flexion and extension, and only mild complaints of pain. Dr. Lennard recommended Plaintiff maintain his conditioning program, limit lifting to ten pounds, occasional bending and avoid professional driving. At that time, no medication was necessary. R. at 168.

On November 16, 2004, Plaintiff presented to Dr. Lennard with ongoing pain

4

extending into both lower extremities, worse on the left. R. at 223. Upon examination, Dr. Lennard noted Plaintiff was a large, overweight male who walked with a limp. He had moderate restrictions in movement and a straight leg test on the left produced back, hip and posterior thigh pain. R. at 223. Plaintiff was to maintain a 20 pound lifting restriction and was given a prescription for Ultracet. R. at 223. On November 23, 2004, Dr. Lennard determined Plaintiff had reached his maximum medical improvement. R. at 222. He encouraged Plaintiff to exercise, lose weight and continue his flexibility program. Plaintiff was to avoid lifting more than 25 pounds and more than occasional bending. R. at 221.

On January 4, 2005, Plaintiff presented to Dr. John Tanksley for a consultation. R. at 246. An MRI revealed findings of greater than fifty percent tear of the rotator cuff, predominately involving the bursal substance as well as the intrasubstance portion of the tendon. R. at 253. On February 17, 2005, Dr. Tanksley performed surgery on Plaintiff to repair his torn rotator cuff. R. at 247.

A hearing was held on March 10, 2005 in front of Administrative Law Judge Linda D. Carter. At the hearing, Plaintiff testified he generally does not drive because his medication makes him drowsy, but had not taken his medication that morning so he could drive himself to the hearing. R. at 35. Plaintiff testified that when his back starts hurting, he has to lay down on the floor and elevate his legs. He has to do this four or five times a day. R. at 36. Plaintiff described the pain in his back as "if you get a Charlie Horse in your leg and it cramps up real bad to where you can't move, you're scared to move, it takes awhile to move– to work the cramp out of your leg." R. at 38. Plaintiff also testified he has little or no activity in his life. He tries to help his wife with small tasks, such as handing her a rake during yard work. R. at 48. He also spends about 30 minutes on the internet each day. R. at 49.

Vocational Expert Terri Crawford ("VE") testified Plaintiff's past work included diesel mechanic, skilled labor performed at the heavy exertional level. R. at 52. The ALJ asked her to assume Plaintiff's age, education and past relevant work experience with medical impairments, including lumbar disc disease, diagnosed as bulging disc with a status post-surgery of continuing lower back pain, obesity, rotator cuff tear with repair

5

and high blood pressure.  Additionally, the VE was asked to consider reduced mobility, obesity, side effects of medication, the need to avoid exposure to, and climbing of, significant unprotected heights, potentially dangerous and/or unguarded moving machinery, and commercial driving. R. at 52.  Further, she was to assume the need for even surfaces upon which to stand and walk, no exposure to extreme vibration, the inability to reach overhead with the right arm, the need for simple to detailed, but not complex, job instructions, and the ability for appropriate response to supervisors and coworkers in the work setting, adapting to change, and using judgment consistent with either unskilled or semiskilled work. R. at 52-53.  The VE testified such person could not do any of Plaintiff's past relevant work and would not have any transferable skills.  R. at 53.  The VE testified Plaintiff could perform some light, unskilled work, such as a Cashier II, but that position would be eliminated if the person needed to alternate sitting and standing at approximately 30 minute intervals. R. at 54.

The VE testified this person could perform light, unskilled tasks allowing for sit/stand options such as an Information Clerk. R. at 54.  However, if the person would need to either lie down or recline and elevate his legs four to time times a day for 15 minutes each time, there would be no work available. R. at 55.

     The ALJ found Plaintiff had generally consistent earnings and has worked in jobs which require heavy exertion and overhead work. Plaintiff had been able to do these jobs in spite of his obesity, foot and knee problems. The ALJ found the record did not show any complaints of side effects from the medication besides some drowsiness. The record did not show Plaintiff requesting stronger pain medication. The ALJ did not find the record to support Plaintiff's assertions of needing to lie on his back and elevate his legs several times a day. He found Plaintiff's allegations of totally disabling, medically determined impairments not credible. R. at 16.

     Based on the record, the ALJ determined Plaintiff retains the capacity to lift and carry up to ten pounds frequently and 20 pounds occasionally; to stand and/or walk for up to six hours in an eight hour day; to sit up to six hours in an eight hour day; should avoid unprotected heights, potentially unguarded moving machinery, commercial driving, and overhead reaching with the non-dominate right arm, and extreme vibration;

6

and needs the ability to alternate sitting and standing at 30 minute intervals. R. at 16. He found Plaintiff is capable of performing other work, such as a Casheir II, with 19,000 jobs in Missouri and 975,000 nationally; and an Information Clerk, with 1300 jobs in Missouri and 110,000 nationally. R. at 17. Finally, the ALJ found Plaintiff has a medically determinable, severe impairment, but does not have an impairment or combination of impairments listed in, or medically equal to on listed in Appendix 1, Subpart P.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

A. Treating Physician

Plaintiff argues the ALJ erred by failing to give controlling weight to treating physicians Dr. Allen, Dr. Lennard, and Dr. Crabtree. A treating physician's opinion is due "controlling weight" if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Id.

In his opinion, the ALJ states he gave "significant weight to the opinions of the

7

claimant's treating physicians, specifically Dr. Lennard." Dr. Lennard instructed Plaintiff to maintain a limitation of lifting 25 pounds and avoid more than occasional bending. R. at 221. The ALJ found this consistent with the State agency medical consultant opinion. R. at 16. Not only did he give Dr. Lennard significant weight, he based his opinion on a more significant limitation of ten pounds frequently and no more than 20 pounds occasionally. The ALJ found Plaintiff could not perform his past relevant work, which included a heavy equipment diesel mechanic. However, he found Plaintiff would not be precluded from performing other work existing in substantial numbers in the national economy, including a Cashier and Information Clerk. R. at 18.

B. Residual Functional Capacity

Plaintiff alleges the ALJ erred by not factoring in his obesity and pain complaints when assessing his residual functional capacity (RFC). The ALJ must determine the claimant's RFC on the basis of relevant evidence. See Roberts v. Apfel, 222 F. 3d 466, 469 (8th Cir. 2000). Relevant evidence includes medical records, observations of treating physicians and others, and Plaintiff's own description of his limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

Dr. Lennard assessed Plaintiff's capacity for work-related activities in November 2004, at that point reporting Plaintiff was at maximum medical improvement. R. at 221. He gave Plaintiff a permanent partial impairment of 15% and limited Plaintiff to 25 pounds lifting and only occasional bending. R. at 221. As discussed in more detail below, the ALJ properly discounted the credibility of Plaintiff's own descriptions of his limitations.

The ALJ properly took into account evidence concerning Plaintiff's obesity. R. at 16. The record indicates Plaintiff has a consistent work record and significant earning levels through 2002. R. at 85-88. Plaintiff is 5'10" and weighs 310 pounds. He testified this was his usual weight and was his weight on the date his alleged disability began. R. at 33. As the ALJ noted, Plaintiff was able to maintain these jobs in spite of his obesity and other ailments prior to the alleged onset of his disability. R. at 16. The ALJ properly determined Plaintiff's RFC based on the relevant evidence.

8

C. Credibility

Plaintiff claims the ALJ erred in discrediting Plaintiff's subjective complaints of pain. There is little doubt that Plaintiff experiences pain – however, pain, alone, does not justify an award of benefits. The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain he experiences. Although a claimant's subjective complaints cannot be disregarded solely because they are not fully supported by objective medical evidence, they may be discounted if there are inconsistencies in the record as a whole. See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996). The standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> [D]irect medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

9

739 F.2d at 1322. An ALJ may properly consider a claimant's exaggeration of his symptoms in evaluating his subjective complaints. Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997).

The ALJ noted inconsistencies between the alleged onset date and statements made by Plaintiff's physicians. Plaintiff testified he had not worked since September 15, 2003. R. at 35. However, on January 4, 2005 Dr. Tanksley noted Plaintiff "continues to work as a diesel mechanic. This required pulling heavy wrenches and working overhead." R. at 254. Dr. Tanksley also reported Plaintiff understood the surgery would require him to miss about three months of work. R. at 251.

Plaintiff alleged he needed to lay down four to five times a day for fifteen to thirty minutes at a time. R. at 16. Only one physician recommended this, and then only immediately following his injury. R. at 123. No other physician endorsed this practice. Plaintiff testified he could only sit for about thirty minutes before his back started throbbing and aching. R. at 40. However, Plaintiff made no complaints of being unable to sit for long periods of time to any of his physicians. Plaintiff made only one complaint over the course of his treatment regarding his pain medication. In February 2004, Dr. Lennard prescribed Ultram to replace Hydrocodone, as Plaintiff complained it was not working. However, the record does not show any other complaints from Plaintiff about his medication. Plaintiff testified the only side effects of his medication was some drowsiness and diarrhea. R. at 34. Because ALJ properly discounted Plaintiff's credibility, he also properly accorded his subjective complaints little weight.

### III. CONCLUSION

For these reasons, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

DATE: March 14, 2006  /s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

10